FILED

18 MAR 15 PM 4:46

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

June 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>VINCENT RAMOS (1),<br>    aka "CEO,"<br>    aka "Business,"<br>KIM AUGUSTUS RODD (2),<br>    aka Visith Vongthai,<br>    aka "Snowstar,"<br>    aka "Global,"<br>YOUNES NASRI (3),<br>    aka "Maestro,"<br>MICHAEL GAMBOA (4),<br>    aka "Chino,"<br>CHRISTOPHER POQUIZ (5),<br>    aka "Caddy,"<br>    aka "Cad,"<br><br>    Defendants. | Case No. __18CR1404WQH__<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 1962(d) – Racketeering Conspiracy to Conduct Enterprise Affairs (RICO Conspiracy); Title 21, U.S.C., Secs. 841(a)(1) and 846 – Conspiracy to Aid and Abet the Distribution of Cocaine; Title 18, U.S.C., Secs. 981(a)(1)(C) and 1963 and Title 28, U.S.C., Sec. 2461(c) – Criminal Forfeiture |

The grand jury charges:

At all times material to this Indictment:

1.  Defendants VINCENT RAMOS, aka "CEO," aka "Business," KIM AUGUSTUS RODD, aka Visith Vongthai, aka "Snowstar," aka "Global," YOUNES NASRI, aka "Maestro," MICHAEL GAMOBA, aka "Chino," CHRISTOPHER POQUIZ, aka "Caddy," aka "Cad," and others constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter

APY:BJKA(2):nlv:San Diego
3/15/18

collectively referred to as "PHANTOM SECURE"), that is, a group of individuals associated-in-fact.

**PHANTOM SECURE OVERVIEW**

2. PHANTOM SECURE was a Canadian-based company that sold encryption services and devices to transnational criminal organizations to facilitate illegal activity. RAMOS, RODD and Individual A started PHANTOM SECURE in approximately 2008. PHANTOM SECURE's devices were specifically designed to prevent law enforcement from actively monitoring the communications between members of transnational criminal organizations. As part of its services PHANTOM SECURE guaranteed that messages stored on its devices could be (and would be) remotely deleted by the company if the device was seized by law enforcement or otherwise compromised.

3. PHANTOM SECURE devices were dedicated data devices housed inside a Blackberry handset. PHANTOM SECURE purchased Blackberries from Blackberry Limited and other Blackberry re-sellers. Whereas the standard Blackberry handset was sold to the public with the capability for voice communication, GPS navigation, camera,, Internet access, and the Blackberry Messenger service, when PHANTOM SECURE received the devices, their technical team removed the internal hardware/software responsible for the GPS, camera, Internet and voice communications. PHANTOM SECURE then installed sophisticated encryption software and routed the data through encrypted servers located in countries believed by PHANTOM SECURE management to be uncooperative with law enforcement. As of 2018, there were at least ten thousand PHANTOM SECURE devices in use worldwide. For more than a decade, PHANTOM SECURE generated tens of millions of dollars in profit through its services.

4.  PHANTOM SECURE did not conduct business with private citizens who, unsolicited, sought to purchase a device and subscribe to its service. Instead, to purchase a device, PHANTOM SECURE required that new customers obtain a personal reference or "vouch" from an existing PHANTOM SECURE client. This restriction helped limit PHANTOM SECURE's customer base to those who use the device for criminal activity.

### The Defendants & Other Individuals

5.  VINCENT RAMOS, aka "CEO," aka "Business," ("RAMOS") was a citizen of Canada and resident of Vancouver, Canada. He was the founder and CEO of PHANTOM SECURE. He controlled PHANTOM SECURE's operations through, in part, the delegation of operational duties to others, including co-defendants KIM AUGUSTUS RODD, YOUNES NASRI, MICHAEL GAMBOA, CHRISTOPHER POQUIZ, and INDIVIDUAL A.

6.  KIM AUGUSTUS RODD, aka Visith Vongthai, aka "Snowstar," aka Global," ("RODD") was a dual citizen of Australia and Thailand, and a resident of Phuket, Thailand. He was a principal at PHANTOM SECURE responsible for distribution of PHANTOM SECURE devices in Australia and Southeast Asia.

7.  YOUNES NASRI, aka "Maestro," aka "Jesse," ("NASRI") was a citizen of Canada residing in Dubai, United Arab Emirates. NASRI was a significant worldwide distributor of PHANTOM SECURE devices.

8.  MICHAEL GAMBOA, aka "Chino," ("GAMBOA") was Canadian citizen residing in Los Angeles, California. GAMBOA distributed PHANTOM SECURE devices in Southern California.

9.  CHRISTOPHER POQUIZ, aka "Cad," aka "Caddy," ("POQUIZ") was a Canadian citizen residing in Los Angeles, California. POQUIZ distributed PHANTOM SECURE devices in Southern California.

10. Individual A was a high-ranking officer of PHANTOM SECURE.

3

## The Enterprise

11. Defendants VINCENT RAMOS, aka "CEO," aka "Business," KIM AUGUSTUS RODD, aka Visith Vongthai, aka "Snowstar," aka "Global," YOUNES NASRI, aka "Maestro," MICHAEL GAMOBA, aka "Chino," CHRISTOPHER POQUIZ, aka "Caddy," aka "Cad," and others, were leaders, members and associates of a criminal organization, hereinafter, the PHANTOM SECURE ENTERPRISE, whose members engaged in acts of drug trafficking, conspiring to aid and abet the distribution and importation of controlled substances, and obstruction of justice. Leaders, members and associates of PHANTOM SECURE operated throughout the world, including Australia, Thailand, Canada, United Arab Emirates, and in the Counties of Los Angeles, Orange, and San Diego within the State of California.

12. PHANTOM SECURE, including its leadership, members, and associates, constituted an "enterprise," as defined at Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

13. Leaders, members and associates of PHANTOM SECURE had defined roles in the enterprise. At all times relevant to this Indictment, defendant RAMOS, RODD, NASRI, GAMBOA, and POQUIZ, and others, participated in the operation and management of the enterprise as follows:

**Administrators:**

14. Administrators were PHANTOM SECURE front office staff who had physical control of the PHANTOM SECURE network and could initiate new

4

subscriptions, remove accounts, remotely delete (i.e, wipe) and reset devices. RAMOS, as the Chief Executive Officer, was the key administrator. RODD also served in a controller-type role for the company. Individual A held an integral role in the design and maintenance of the security integrity of PHANTOM SECURE.

**Distributors:**

15. Distributors coordinated agents and resellers of PHANTOM SECURE devices, received payments for ongoing subscription fees, sent associated funds (minus personal profit) back to the parent company, and provided second-level technical support. The distributors communicated directly with PHANTOM SECURE administrators. NASRI, POQUIZ, and GAMBOA were all distributors for PHANTOM SECURE.

**Agents:**

16. Agents physically sourced and engage with new customers to sell and deliver devices with initial subscriptions. The agents earned profit on the sale of the handset only and provided first-level technical support to their small group of customers.

### Objectives of the Enterprise

17. PHANTOM SECURE's objectives included the following:

   A.  To create, maintain and control a method of secure communication to facilitate the importation, exportation, and distribution of illegal drugs into Australia, Asia, Europe, and North America, including the United States and Canada, and the laundering of proceeds of such drug trafficking conduct;

   B.  To obstruct investigations of drug trafficking and money laundering organizations by creating, maintaining, and controlling a system whereby PHANTOM SECURE would remotely delete evidence of such activities;

5

1    C.   To enrich the leaders, members, and associates of the
2 enterprise by taking payment from the sale of each PHANTOM SECURE device;
3    D.   To promote and enhance the reputation and standing of
4 PHANTOM SECURE and its leaders, members, and associates;
5    E.   To preserve and protect PHANTOM SECURE's profits and
6 client base through acts of money laundering;
7    F.   To protect PHANTOM SECURE and its leaders, members, and
8 associates from detection, apprehension, and prosecution by law
9 enforcement;
10   G.   To avoid detection of PHANTOM SECURE's illicit conduct
11 by, among other things, laundering its illegal proceeds, communicating
12 with encrypted devices, and transferring illegally-obtained funds into
13 cryptocurrency, specifically Bitcoin;
14   H.   To evade law enforcement by, among other things,
15 maintaining the organization's technical infrastructure outside the
16 United States and Canada; and
17   I.   To enhance its power and financial profits by promoting
18 PHANTOM SECURE's activities with customers and potential customers.

### Manner and Means of the Enterprise

20   18.  The means and methods by which the defendants and other members
21 and associates of PHANTOM SECURE conducted and participated in the
22 affairs of the enterprise included, but were not limited to, the
23 following:
24   A.   PHANTOM SECURE Administrators operated the PHANTOM SECURE
25 NETWORK, which used PHANTOM SECURE devices to send and receive encrypted
26 messages. To stay outside the reach of law enforcement, PHANTOM SECURE
27 maintained its servers in Panama and Hong Kong, and used proxy servers
28 to further disguise the physical locations of its servers.

B. PHANTOM SECURE Distributors provided PHANTOM SECURE devices to their clients (i.e. "Executives") and collected a subscription fee of approximately $2,000 per six-month period. To impede law enforcement's ability to penetrate the PHANTOM SECURE network, the Administrators, Distributors and Agents of PHANTOM SECURE required a personal reference (i.e. a vouch) from existing clients before selling a device and its services to a new client.

C. PHANTOM SECURE Administrators, Distributors, and Agents employed the use of code words, such as "executives," to describe clients it knew or had reason to knows participated in illegal activities, including international drug trafficking.

D. PHANTOM SECURE Administrators, Distributors, Agents, and "Executives" strove to achieve shared anonymity, in order to evade law enforcement and escape the other consequence of their criminal activities. To that end, PHANTOM SECURE Administrators, Distributors, Agents, and "Executives" remained anonymous even to each other. PHANTOM SECURE Administrators, Distributors, and Agents did not request, track or record their clients' real names, and interacted only via username, email handles or nicknames.

E. PHANTOM SECURE's Administrators, Distributors, Agents, and "Executives" distributed and facilitated the distribution of, controlled substances, including heroin, cocaine, and methamphetamine, using PHANTOM SECURE devices.

F. PHANTOM SECURE Administrators, Distributors, and Agents obstructed law enforcement by deleting (i.e. wiping) devices that had been seized by law enforcement to destroy evidence that the devices contained. PHANTOM SECURE Administrators, Distributors, and Agents also suspended service and deleted the contents of devices if they suspected

7

law enforcement or an informant was using the PHANTOM SECURE device as part of an investigation.

   G. PHANTOM SECURE Administrators, Distributors, and Agents facilitated the illegal activities of its "Executive" clients, including drug trafficking and money laundering;

   H. PHANTOM SECURE Administrators, Distributors, and Agents used digital currencies, including Bitcoin, to facilitate illegal transactions to protect the membership's anonymity, and to facilitate the laundering of the membership's ill-gotten gains. PHANTOM SECURE Administrators, Distributors, and Agents also set up and maintained shell companies to hide the proceeds generated by selling its encryption services and devices.

## Count 1

### (RACKETEERING CONSPIRACY)

 19. Paragraphs 1 through 18 are re-alleged and incorporated by reference herein.

 20. Beginning at least as early as 2008 and continuing up to and including March 7, 2018, within the Southern District of California and elsewhere, defendants VINCENT RAMOS, aka "CEO," aka "Business," KIM AUGUSTUS RODD, aka Visith Vongthai, aka "Snowstar," aka "Global," YOUNES NASRI, aka "Maestro," MICHAEL GAMOBA, aka "Chino," CHRISTOPHER POQUIZ, aka "Caddy," aka "Cad," and others, being persons employed by and associated with PHANTOM SECURE, which was engaged in, and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conspire with each other, and with others, to violate Title 18, United States Code, Section 1962(c), that is to conduct and participate, directly and indirectly, in the conduct of PHANTOM SECURE's

affairs through a pattern of racketeering activity involving acts indictable under the following statutes:

    A. Title 21, United States Code, Section 841 (distribution and possession with intent to distribute narcotics);

    B. Title 21, United States Code, Section 952 (importation of controlled substances);

    C. Title 21, United States Code, Section 846 (conspiracy to aid and abet the distribution of controlled substances);

    D. Title 21, United States Code, Sections 952, 960, and 963 (conspiracy to aid and abet the importation of controlled substances); and

    E. Title 18, United States Code, Section 1512(c) (obstruction of justice)

21. It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of activity in the conduct of the affairs of the PHANTOM SECURE ENTERPRISE.

All in violation of Title 18, United States Code, Section 1962(d).

### Count 2
(Conspiracy to Aid and Abet the Distribution of Cocaine)

Beginning as early as 2008 and continuing up to and including March 7, 2018, within the Southern District of California and elsewhere, defendants VINCENT RAMOS, aka "CEO," aka "Business," KIM AUGUSTUS RODD, aka Visith Vongthai, aka "Snowstar," aka "Global," YOUNES NASRI, aka "Maestro," MICHAEL GAMBOA, aka "Chino," CHRISTOPHER POQUIZ, aka "Caddy," aka "Cad," did knowingly and intentionally conspire with each other and others to aid and abet the distribution of at least 5 kilograms of a mixture and substance containing a detectable amount of cocaine, a

Schedule II Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

### Forfeiture Allegation

### (RACKETEERING CONSPIRACY FORFEITURE)

22. The allegations contained in Count 1 and Paragraphs 1 through 18 are re-alleged and by their reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America under Title 18, United States Code, Section 1963.

23. As a result of the violation of Title 18, United States Code, Section 1962, as alleged in Count 1, defendants VINCENT RAMOS, aka "CEO," aka "Business," KIM AUGUSTUS RODD, aka Visith Vongthai, aka "Snowstar," aka "Global," YOUNES NASRI, aka "Maestro," MICHAEL GAMOBA, aka "Chino," and CHRISTOPHER POQUIZ, aka "Caddy," aka "Cad," have:

    A. acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States under Title 18, United States Code, Section 1963(a)(1);

    B. an interest in, security of, claims against, and property and contractual rights affording a source of influence over PHANTOM SECURE, which these defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States under Title 18, United States Code, Section 1963(a)(2); and,

    C. property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity and unlawful debt collection, in violation of Title 18, United States Code, Section 1962,

which property is subject to forfeiture to the United States under Title 18, United States Code, Section 1963(a)(3).

24. The property and interests of said defendants subject to forfeiture to the United States under Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), include but are not limited to:

    A. A sum of money of at least $80,000,000 (USD) and all interests and proceeds traceable thereto,

    B. The contents of Vault 314, located at U.S. Private Vault, 9182 West Olympic Boulevard, Beverly Hills, California, 90212, including:

        a. $101,080.00 U.S. Currency;

        b. Fourteen (14) 1oz gold Eagle coins;

        c. Five (5) 1oz gold Eagle coins;

        d. Seven (7) 1oz gold Buffalo coins.

    C. $106,857.57 seized from JP Morgan Chase Bank Account ▮▮▮▮0389, held in the name of Enspire Mobile Technologies Inc.

    D. Real Property located at ▮▮▮▮, Winchester, NV with the following legal description: ASSESSOR DESCRIPTION: TURNBERRY TOWERS AT PARADISE ROAD & KAREN AVENUE PLAT BOOK 137 PAGE 57 UNIT 305 BLDG WEST GEOID: PT N2 NW4 SEC 10 21 61.

    E. All right, title, and interest in the following Blackberry Enterprise Server, Server Routing Protocol Identifiers (SRPIDs):

        1) S90255119

        2) S10307330

        3) S28070374

        4) S49610811

        5) S64475866

|    | 6) | S80383239 |
|----|----|-----------|
|    | 7) | S83950726 |
|    | 8) | S83950727 |
|    | 9) | S86597007 |

F. All right, title and interest in at least 150 PHANTOM SECURE ENTERPRISE domain names;

G. All funds and contents of the following bank accounts and safe deposit box:

|    | BANK | ACCOUNT # | ACCOUNT IN THE NAME(s) OF | SIGNER(s) |
|----|------|-----------|---------------------------|-----------|
| 1) | Bank of America | ▮-8385 | Vincent Ramos | Vincent Ramos |
| 2) | Bank of America | ▮-7182 | Vincent Ramos | Vincent Ramos |
| 3) | Bank of America | ▮-7179 | Vincent Ramos | Vincent Ramos |

### Substitute Property Forfeiture

25. If any of the above-described forfeitable property, as a result of any act or omission of said defendants —

    1) cannot be located upon the exercise of due diligence;

    2) has been transferred or sold to, or deposited with, a third party;

    3) has been placed beyond the jurisdiction of the Court;

    4) has been substantially diminished in value; or

    5) has been commingled with other property which cannot be subdivided without difficulty;

//
//
//
//

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of said defendants up to the value of the property listed above as being subject to forfeiture.

26. Said defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 1963, and Title 28, United States Code, Section 2461(c).

DATED: March 15, 2018.

A TRUE BILL:

_____
Foreperson

ADAM L. BRAVERMAN
United States Attorney

By: _____
ANDREW P. YOUNG
Assistant U.S. Attorney

By: _____
MARK W. PLETCHER
Assistant U.S. Attorney

By: _____
BENJAMIN J. KATZ
Assistant U.S. Attorney