```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED STATES OF AMERICA,          )
                                        )
 5        Plaintiff,                    )  No. 18-CR-1404-WQH
                                        )
 6             v.                       )  May 28, 2019
                                        )
 7   VINCENT RAMOS,                     )  10:09 a.m.
                                        )
 8        Defendant.                    )  San Diego, California
     _____)
 9

10

11          EXCERPTED TRANSCRIPT OF SENTENCING HEARING
             BEFORE THE HONORABLE WILLIAM Q. HAYES
12                UNITED STATES DISTRICT JUDGE

     APPEARANCES:
13
     For the Plaintiff:        United States Attorney's Office
14                             By:  ANDREW YOUNG, ESQ.
                                    BENJAMIN KATZ, ESQ.
15                             880 Front Street, Room 6293
                               San Diego, California  92101
16
     For the Defendant:        Law Offices of Victor Sherman
17                             By:  VICTOR SHERMAN, ESQ.
                               2115 Maine Street
18                             Santa Monica, California 90405

19                             Law Office of Michael Pancer
                               By:  MICHAEL PANCER, ESQ.
20                             105 West F Street, 4th Floor
                               San Diego, California 92101
21

22   Court Reporter:           Melinda S. Setterman, RPR, CRR
                               District Court Clerk's Office
23                             333 West Broadway, Suite 420
                               San Diego, California, 92101
24                             melinda_setterman@casd.uscourts.gov

25   Reported by Stenotype, Transcribed by Computer
```

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | SAN DIEGO, CALIFORNIA, MAY 28, 2019, 10:09 A.M.             |
|       | 2  | * * * *                                                     |
|       | 3  | THE CLERK:  Number 4, 18-CR-1404, United States vs          |
|       | 4  | Vincent Ramos, for sentencing.                              |
| 10:09 | 5  | MR. SHERMAN:  Good morning, Your Honor.  Victor             |
|       | 6  | Sherman and Michael Pancer present for Mr. Ramos.           |
|       | 7  | THE COURT:  Good morning, sir.                              |
|       | 8  | MR. PANCER:  Good morning, Your Honor.                      |
|       | 9  | MR. KATZ:  Good morning, Your Honor.  Benjamin Katz         |
| 10:10 | 10 | and Andrew Young for the United States.                     |
|       | 11 | THE COURT:  Good morning.                                   |
|       | 12 | (Defendant present.)                                        |
|       | 13 | THE COURT:  All right.  Counsel, your client is             |
|       | 14 | present; is that correct?                                   |
| 10:11 | 15 | MR. SHERMAN:  That is correct, Your Honor.                  |
|       | 16 | THE COURT:  All right.  Counsel, I have reviewed the        |
|       | 17 | presentence report, the government's sentencing summary chart, |
|       | 18 | the government's sentencing motion, the government's motion, |
|       | 19 | the defense sentencing summary chart, the defense sentencing |
| 10:11 | 20 | motion with exhibits, and the defense supplemental sentencing |
|       | 21 | documents.                                                  |
|       | 22 | Have you had an opportunity to review and discuss the       |
|       | 23 | presentence report with your client?                        |
|       | 24 | MR. SHERMAN:  I have, Your Honor.                           |
| 10:11 | 25 | THE COURT:  And is it correct to say that there were        |

1    no objections filed to the presentence report?

2         MR. SHERMAN:  That is correct.

3         THE COURT:  Counsel, before we begin, I have one

4    question with the government's sentencing summary chart, can I

10:11  5    see counsel at sidebar briefly.

6         (Sidebar proceedings took place, record sealed.)

7         THE COURT:  All right.  Counsel, are there any

8    comments that you would like to make with respect to the

9    sentence that the Court should impose?

10:17  10         MR. SHERMAN:  Yes, Your Honor.  First of all, I did

11    provide your clerk with a letter from the defendant's

12    10-year-old daughter, and I did provide a copy to the

13    government.

14         THE COURT:  All right.  Counsel, I have reviewed that

10:19  15    letter as well.  Are there any comments you would like to make,

16    sir?

17         MR. SHERMAN:  Yes, Your Honor.  First of all, I would

18    like to acknowledge that the defendant's support this morning

19    in court is his wife, his sister, his brother, and

10:19  20    sister-in-law.  All of them are present in the back row, Your

21    Honor.  And his mother is also present.

22         His father is present in San Diego with the three

23    younger children.  He is back at the hotel.  So all of those

24    people did come down here today.

10:19  25         First of all, Your Honor, I would like to thank

1    Mr. Young and his co-counsel in this case.  I think they have

2    been fair with the defendant.  We went through some troubled

3    times at the beginning, but in the end they are very patient,

4    and I do think that they have acted fairly in this matter, and

10:19    5    I do appreciate that, as does Mr. Pancer and does Mr. Ramos.

6           Obviously, we disagree with their recommendation as

7    far as the length of time, but I do think that they have

8    attempted to be as fair as possible in this case.

9           This is a difficult case from a defense point of view

10:20    10    because on the one hand we've got to know Mr. Ramos, Mr. Pancer

11    and myself, and I think that in his heart he is a good person,

12    and he has tried to live a good life.  He's tried to help his

13    family and support his family for this past 10 or 12 years,

14    ever since he married his wife.  He is the father of, you know,

10:20    15    three young children.  They are 6, 8, and 10.

16           The government is making a recommendation of a

17    sentence of custody time which would -- if he had to serve the

18    entire period of time would be approximately 12 years in jail.

19    Now, 12 years in jail for somebody 41 years old and having

10:20    20    three young children 6, 8, and 10, is an enormous sentence, not

21    only for himself but for the children.

22           He's going to miss, you know, maybe the most important

23    times for a child growing up, being that age, when they need

24    the influence of the father.  And, of course, as you've seen

10:21    25    from this letter that we submitted today from the 10-year-old

1    daughter, you know, the children are very close to fair father,

2    and they need their father at this time.  So it is a very

3    difficult situation from the family's point of view.

4            Moreover, the family lives in Canada, and the

5    likelihood of him being able to visit either the wife or the

6    children on any regular basis is not very likely.  I think they

7    have seen him a few times since he's been in custody here in

8    San Diego, but it is a very difficult thing to do to come down,

9    get the family together, have the funds necessary to come to

10   San Diego, you know, get a hotel room, et cetera.

11           So it is going to be a very difficult period of time

12   for his wife and his children over the next period of years to

13   be able to see Mr. Ramos on any kind of a regular basis.

14   Obviously, there is phone contact, but that is hardly the same

15   as having face-to-face contact with your father.

16           And for Mr. Ramos's point of view, the idea that he

17   will not be able to have a real relationship with his children

18   for possibly more than a decade is, as the probation report

19   notes, paragraph 58, almost something that is unbearable for

20   him because he is very close to his children.  So from a

21   personal point of view, at least from our picture, the impact

22   upon his family and he is enormous.

23           Also, his parents are 80 and 85 years of age and not

24   in great health, and the idea that he probably or very likely

25   might be in custody during the period of time that they get

1    older and might pass is an excruciating, painful thought to

2    Mr. Ramos.

3            So from the point of view of punishment, which is

4    obviously an important factor for the Court to take into

10:23    5    consideration, I don't think that anyone could be more punished

6    than Mr. Ramos, the pain of what he's done and what he's done

7    to his family, and the idea that these kids are go going to

8    grow up without him being there and the parents being the age

9    that they are is, you know -- the next number of years is going

10:23   10   to be an enormous, enormous, every minute of every day, a

11   painful experience for Mr. Ramos.

12           At the same time, he does recognize the fact that he

13   committed a serious offenses, and obviously the Court has to

14   take that into consideration, so we're asking the Court to

10:23   15   balance both sides of this, the need to protect society and

16   also the idea that the punishment Mr. Ramos is going to suffer

17   is going to be great, both because of the age of the children

18   and because, of course, his family lives in a different

19   country.

10:23   20           Now, the government agrees, in its sentencing

21   memorandum -- and I appreciate that, and Mr. Young has brought

22   this to my attention, even as much as there -- as this

23   morning -- that Mr. Ramos is the first person that has been

24   prosecuted for the offense that he committed in this case.

10:24   25           Now, it is a kind of two-edged sword to be honest.  On

1    the one hand, I think Mr. Ramos's attitude was, as we put in

2    our sentencing memorandum, I am not dealing with these drug

3    dealers; they are one or two steps away from me; I am selling a

4    phone; I am in a business.  Somehow in his own mind he didn't

10:24   5    really connect, as he should have, obviously, the idea that he

6    was providing a service that could do great damage.

7          But there wasn't a rule out there or a precedent out

8    there or something that would tell him that he was doing

9    something wrong.  And I am sure that Mr. Ramos greatly regrets

10:25  10    his behavior, and he understands that what he did was a grave

11    mistake.

12          On the other hand, as the government concedes, there

13    wasn't a rule or a precedent for him to say, aha, others have

14    done this, and this is something that can't be done.  Now, as

10:25  15    lawyers, we understand conspiracy laws, so for us to look at

16    the facts this case, we can say obviously you can't sell a

17    phone in you know the phone is being used in some kind of an

18    illegal way.  That seems obvious to us.  I don't think that it

19    was obvious to Mr. Ramos.

10:25  20          And to the extent that his state of mind was such, I

21    think that is somewhat of a mitigating factor.  I don't think

22    that I am relying completely on that.  But I do believe that he

23    originally started his plan and it was not with the intention

24    of doing what ended up happening.

10:25  25          Now, one can look at this and say, you know, he wasn't

1    very clever about this if he really had a criminal mind-set

2    because the phones were easily traceable to him, and if you are

3    selling all these phones to people that are using them illegal,

4    how in the world if you think that you are doing something

10:26    5    wrong you are not eventually going to be caught because it is

6    so obvious to be able to trace the product?

7             So to the extent that it has some bearing on

8    Mr. Ramos's state of mind, I would ask the Court to take that

9    into consideration.

10:26    10             Now, Mr. Ramos after he was arrested and over a series

11    of many meetings with the Government did, as the prosecutor

12    just told the Court at sidebar, did divulge and disclose all of

13    the assets in this case.  And so the fact that Mr. Ramos did

14    make and did had significant property at the time that he was

10:26    15    arrested in this case, that is all gone, and whatever fruits of

16    the crime that he was able to accumulate over the period of

17    time, it is no more.

18             And now he's left his wife -- the government, again, I

19    appreciate it, as Mr. Pancer appreciates it, they did allow

10:27    20    some proceeds from the sale of the home to go back to the wife

21    so at least she has at least a few years of financial stability

22    for which we're very grateful, but that is going to run out,

23    you know, very quickly.

24             And when Mr. Ramos is eventually freed from custody,

10:27    25    whenever that might be, he is going to be, you know, maybe in

1    his late 40s, early 50s, and he is going to have to start all

2    over with now children that are reaching maturity age, and it

3    is going to be a very, very difficult period of time when he

4    has to go back into society.

10:27    5         The government, Mr. Pancer, and I did come to an

6    agreement which I think the Court should take into

7    consideration.  The fact that the government said in the plea

8    agreement, okay, if he does five years in custody in the United

9    States, we're satisfy with that amount of time in custody, and

10:28    10    that -- and after that five years, you are then free to apply

11    to the various authorities, both the Canadian and American

12    authorities to be transferred back to Canada.

13         And they -- by that, as we put in our sentencing

14    memorandum, seemed to agree that -- or satisfy that five years

10:28    15    of actual custody, plus a period of time that it takes to

16    possibly get transferred back to Canada, will be sufficient

17    punishment in this case, given all of the facts.

18         And I think the government took into consideration

19    that decision that he was the first individual being prosecuted

10:28    20    like this, that he did have a young family, that he was giving

21    up millions of dollars worth of assets, that he was being

22    cooperative with the government, and all of those factors.

23         So, obviously, the hope in this case is that Mr. Ramos

24    after this five-year period of time and then he can apply to

10:29    25    the authorities will be transferred back to Canada.  Now, my

1  experience in these issues in the past about being transferred

2  is sometimes they work, sometimes they don't work.  I know that

3  they usually take anywhere between 1 to 2 years, 18 months to

4  2 years, if they work at all.

10:29  5        I do believe that the American government is not going

6  to oppose this case -- this transfer, but in the last few years

7  the Canadian authorities seem not to readily accept individuals

8  back into the system in Canada, for whatever reason I am not

9  sure, but it may be because they have to supervise them and

10:29  10  there is costs involved, so their attitude may be just leave

11  them in the United States; let them do time in the United

12  States; we don't want them back.

13        I don't know what is going to happen.  It is another

14  four years before he can even apply, and I don't know what the

10:29  15  politics might be of both the United States and Canada at that

16  time.

17        So in the recommendation we made in this case, we're

18  asking the Court to take into consideration the fact that his

19  transfer to Canada may or may not happen, and if I was to

10:30  20  guess, I would say it is no better than fifty-fifty, so give

21  him a sentence that takes into consideration five years in

22  custody here in the United States -- approximately two years

23  more of that would be the normal time if, in fact, he does get

24  the transfer; that is about seven years -- and then give him a

10:30  25  nine-year sentence because that would seem to satisfy both

1    sides as far as the plea bargaining.

2         The government's opinion that five years in custody in

3    the United States is sufficient, plus a period of time to

4    possibly transfer to Canada, and at the same time that gives

10:30  5    Mr. Ramos some -- some kind of goal that he knows, okay, if I

6    do seven years about in the United States, whether I get

7    transferred to Canada or not, at least that is something that

8    is more easily lived with, so we're asking the Court to impose

9    a sentence of 97 months based upon that theory.

10:31 10         Now, seven years in custody is still a very lengthy

11    sentence for a first offender, even given the facts of this

12    case.  At that time his 10 year old will be 17, and the other

13    children will be teenagers.  They will be away from their

14    father for seven years or so.

10:31 15         The parents, hopefully they will still be alive, but

16    we're talking about the parents at that time, if they are

17    alive, they are 87 and 92.  His wife, of course, at that point

18    will be out of funds, and she is obviously going to have to

19    work with three children to even take care when the money runs

10:31 20    out for which the government allowed her to have some funds.

21         So maybe this family can reconnect and maybe they can

22    still be a family at that point, which is the hope, obviously.

23         So I am asking the Court, Mr. Pancer is asking the

24    Court, and the defendant is asking the Court to impose a

10:32 25    sentence of 97 months.  Again, it takes into consideration what

1   the government's aim in this case was that he serve at least

2   five years in the United States plus a period of time to

3   transfer to Canada.

4        For a first offender of his age, that is still a

10:32   5   lengthy, lengthy period of time.  When I think about in my life

6   going back seven years, I can hardly remember what seven years

7   ago was like, and so that is a long, long time for your very

8   first offense.

9        And that is what I would ask the Court to do in this

10:32   10   case.

11        THE COURT:  Thank you, sir.

12        Are there any comments that would you like to make,

13   Mr. Ramos?

14        THE DEFENDANT:  Yeah, good morning, Your Honorable

10:32   15   Hayes.  For the past several months I've been thinking about

16   what I would say when given this chance.  What I can say is the

17   truth and from my heart.

18        I am sorry and accept responsibility for my actions

19   that have led me to where I am today.  I apologize to the

10:33   20   Court, the government, and anybody that may have been

21   negatively impacted by my conduct.

22        I apologize to my family and thank them for their

23   support.  To my wife, I thank you for everything that you do.

24   I love and appreciate you.

10:33   25        Your Honor, I deeply regret and I am remorseful for my

1    actions and negligence that allowed my company to grow the way

2    that it did.  I made mistakes and decisions that I cannot take

3    back.  I should have acted more responsibly.

4          As I stand here in your courtroom today with my fate

10:33    5    and future in your hands, I ask and hope for your leniency when

6    making your decision when imposing your sentence.  I am truly

7    sorry, Your Honor.  Thank you.

8          THE COURT:  Thank you, sir.

9          From the government.

10:34   10         MR. YOUNG:  Yes, Your Honor.  Thank you.

11          First, as a housekeeping matter, counsel I think

12    implied that the government would be satisfied with a sentence

13    OF less than what our recommendation actually is based on a

14    consideration that we gave in the plea agreement.  Just to be

10:34   15    clear, after five years, the United States Attorney's Office

16    will no longer oppose a transfer back to Canada by this

17    defendant.

18          That will take a certain period of time to put that

19    application together, it is theoretical, whether it will be

10:34   20    granted, how long it will take.  None of that is intended to

21    imply what the government is actually recommending here.  It

22    stands by the recommendation that this Court is well aware of.

23          And that recommendation has to do with the amount of

24    time that he spends in custody, whether it is in the United

10:34   25    States or Canada, we stand firm with the position we provided

1   the from the government.

2         Now, we filed extensive pleadings in this case, and I

3   don't want to belabor what we already said to the Court, but I

4   do want to reinforce two main points here.  One is the full

10:35   5   scope of the crime and the defendant's involvement in it, and

6   the general deterrence effect of the sentence here today.

7         The scope of this crime, Your Honor, is staggering.

8   If you take the defendant's estimates of how many users were on

9   the fantasy secure network, his estimate, not the governments,

10:35   10   it is 7,000 users.  The government, the United States law

11   enforcement, Australian law enforcement and Canadian law

12   enforcement has yet to identify a single legitimate user of

13   this platform, despite extensive efforts to do so.

14         What we have identified are criminal users.  One who,

10:35   15   as we mentioned in our papers, one of the users has been before

16   this Court before.  And to put it in context, that individual

17   and his group, which was approximately six to seven people,

18   trafficked more than a ton of cocaine from Mexico to Canada and

19   ultimately to Australia.

10:35   20         Those are seven users of the 7,000 other users that

21   this defendant facilitated the commission of crimes.  Those

22   crimes includes, certainly, drug trafficking, which this

23   defendant was more than aware of and murder, which he probably

24   was not.

10:36   25         But with regard to the drug trafficking, the defendant

1    was fully aware of what his users were doing for the reasons

2    stated in our papers.  He was on -- there is two text messages

3    that we attached as exhibits that show that story, one of which

4    is a user asking to have his device deleted because it has been

10:36    5    seized by the cops, and the word "cops" was used in this

6    message.  The defendant was CCed on that message.  And another

7    text message that he sent traveling back from Mexico City to

8    one of his business associates where he uses the phrase

9    "Sinaloa cartel" and "successful business trip."

10:36    10           Your Honor, if you just took those two messages alone,

11    it would show -- lay bear the full awareness that the defendant

12    had of how these devices were used, how his company was used,

13    the success that theses people having, and the full scope of

14    his crime.  In fact, we're talking about levels of drug

10:37    15    trafficking that are just probably not even contemplated by the

16    sentencing guidelines because they are so staggering, so high.

17           In addition to his personal involvement, as we laid

18    out in the papers, part of the marketing employ, marketing

19    pitch for this product, was the fact that they took efforts to

10:37    20    impede law enforcement, to obstruct law enforcement, to prevent

21    law enforcement from being able to execute its lawful duties in

22    investigating and uncovering crimes, including placing servers

23    in Panama and Hong Kong, requiring personal references, using

24    code words, as I mentioned before deleting devices that are

10:37    25    seized by law enforcement, using crypto currencies as payment

1    to hide the true users, and often -- he often described law

2    enforcement in his own messages as, quote-unquote,

3    unfriendlies.

4         With regard to general deterrence, Your Honor, as

10:38   5    defense counsel said in his statements, this is the first

6    individual we prosecuted for this particular type of crime by

7    the United States government.  That is a double-edged sword

8    because this sentencing is being closely watched by a lot of

9    people who are in this world.

10:38   10    And that includes the dark web, that includes crypto

11   currencies, that includes the use of encryption communications

12   like this defendant was particularly involved.  And they are

13   watching what happens here today.  They are watching the

14   sentencing.  And they are making decisions based on whether or

10:38   15   not they are going to continue to provide these products and

16   technology to criminals and whether it is worth the risk.

17        Now, defendant and defense counsel went at length --

18   or defense counsel went at length about how the defendant

19   wasn't fully aware that this was a crime, didn't really grasp

10:38   20   the full severity of everything that he was doing, and I think

21   it is important to make a distinction between knowing that

22   something is illegal and knowing that you are not going to get

23   prosecuted for it -- or believing that you are not going to get

24   prosecuted for it, and I think this defendant fell in the

10:39   25   latter category.

10:39

1       He was not prosecuted because he was selling encrypted

2   communications and encrypted devices to criminals.  He was

3   prosecuted because he was in agreement with these people

4   providing them the technology that they could use to facilitate

5   their crimes, and the criminals that are spilling into this

6   industry are the most sophisticated in the world.  These are

7   not on the street.  They are not using burner phones.  These

8   are some of the most sophisticated criminals in the world using

9   some of the most sophisticated technology in the world to hide

10   from law enforcement.

11       And so whether that is individuals who are running

12   dark web websites or selling encrypted communications or

13   facilitating the use of crypto currencies, all of those

14   individuals could be affected by what happens here today.

15       And with those statements, we ask the Court to take

16   all that into consideration in bring a sentence that is going

17   to impose today.  Unless the Court has any other questions, I

18   will an a submit.

19       THE COURT:  Thank you.

20       In this instance, defendant did plead guilty to

21   violation of Title 18, United States Code, Section 1962(d),

22   racketeering, conspiracy to conduct enterprise affairs.

23       As set forth in the plea agreement, a small portion of

24   it, gives some description of the defendant's criminal conduct.

25   That is on page five of the plea agreement.

 1          Through Phantom Secure, the defendant and others

 2     facilitated the importation exportation distribution of

 3     wholesale quantities of cocaine, heroin, and methamphetamine

 4     throughout the world, including the United States, Australia,

10:40   5     Mexico, Canada, Thailand, and Europe.

 6          It was reasonably foreseeable to the defendant that as

 7     part of this conspiracy, Phantom Secure customers would and did

 8     use Phantom Secure's devices to coordinate the importation,

 9     exportation, and distribution of more than 450 kilograms of

10:40  10     cocaine.  Through Phantom Secure the defendant and others

11     manufactured and sold devices to send and receive encrypted

12     messages.

13          And to stay outside the reach of law enforcement in

14     the United States, the defendant and others maintained Phantom

10:41  15     Secure services in Panama and Hong Kong.  Through Phantom

16     Secure to impede law enforcement, the defendant and others

17     required a personal reference from existing clients before

18     selling a device and services to a new customer.

19          With respect to the Advisory Sentencing Guidelines,

10:41  20     the Court finds that the base offense level starts at a 38.

21     There is a plus four for role, pursuant to Section 3B1.1A,

22     organizer or leader of more than five participants.

23          The adjusted offense level is 42.  There is a

24     three-level reduction for acceptance of responsibility.

10:41  25          The total offense level is 39.  Mr. Ramos has no

1  criminal history points which places him in Criminal History

2  Category 1.

3         The government departs four levels, pursuant to

4  Section 5K 1.1, which the Court finds to be well supported in

10:42  5  the materials that have been provided to the Court.  I would

6  note -- I would compliment the lawyers on both sides.  I

7  thought the sentencing materials that were provided to the

8  Court were very helpful from the government and from the

9  defense, and your presentations today have also been very

10:42  10  helpful.

11         I do find that the guideline range is 151 to 188.

12         The Court declines to depart downward for any other

13  basis -- on any other basis.  Although I'll consider those --

14  any other arguments under the 3553 factors.

10:42  15         The nature and circumstances of the offense, I think

16  it can fairly be described as aggravated when one considers the

17  number of the users, even if you take the number -- you know,

18  the users at the lower end, and that is 7,000, I mean,

19  certainly there were a number of people that were involved, and

10:42  20  the business was -- if it wasn't set up to assist criminals, I

21  mean, my sense is fairly early on that became the main purpose

22  and that became the main marketing pitch.

23         Although, I certainly under Mr. Ramos's history and

24  that he demonstrated an interest in business and in forming a

10:43  25  business at 10 or 11 or 12, and that he had an interest in

1    forming a company.

2         But my view of it is clearly early on in the process

3    that it became a business that was set -- or that continued to

4    aid and abet or to assist criminals.

10:43   5         I understand that the amount was started with respect

6    to 38 -- or the base offense level starts at a 38, and then

7    Mr. Hanson's -- the amount of narcotics that were used by

8    Mr. Hanson was set -- was determined -- was used to set the

9    base offense level.  Is that fair to say?

10:43  10         MR. KATZ:  Yes, Your Honor.

11         THE COURT:  And I think that certainly is a reasonable

12    place to start.  I -- candidly, though, I don't know -- my

13    sense is Mr. Hanson was going to be involved in the drug

14    business, and it was going to be to the extent it was with or

10:43  15    without Mr. Ramos.  I think that certainly Mr. Ramos -- there

16    is no real disagreement that his company was set up and he

17    marketed it to assist people who were involved in criminal

18    activities.

19         Although, certainly, with Mr. Hanson, my sense is

10:44  20    Mr. Hanson was going to be -- he was in the drug business and

21    he was going to be in the drug business with or without

22    Mr. Ramos.  That may have given him some false sense of

23    security, but I don't know that whether he met Mr. Ramos or did

24    not, that his involvement in the drug activities would have

10:44  25    been any different.

10:44

10:45

10:45

10:45

10:46

        The history and characteristics of Mr. Ramos, as with

many individuals who come before the Court, mixed.  He is a

gentleman -- well spoken.  Three relative -- four children,

relatively -- three children that are relatively young in age.

The Court has reviewed many, many letters that speak very well

of Mr. Ramos.  Somebody who at an early age had interest in,

you know, businesses and things of that nature.

        Obviously, very talented businessman, was very

successful in legitimate employment activities before he got

involved in what he did, but seems to be -- must have been

fairly engaging because he was quite successful in businesses

that required interpersonal -- interpersonal contacts as well

as a sales ability.

        Then at some point, whether it was the lure of the

money or who knows what it was, but at some point he became

very successful in the business he was in, and that was -- he

was committing crimes by doing it, and at some point I have no

doubt that he understood what he was doing was criminal, and he

assisted some criminals of -- on a very, very large scale to

continue with their, you know, their efforts.

        The need for the sentence to reflect the seriousness

of the offense, promote respect for the law and to provide just

punishment.  I have certainly considered all the arguments that

you each make.  You have very good points.  I am certainly

aware that -- with respect to specific deterrence, I don't

1    think that -- I think that any significant sentence would deter

2    Mr. Ramos in light of where he finds himself.

3            And with respect to the general deterrence, I

4    understand certainly the parties' respective views of that.

10:46    5            In this instance, I've considers all the 3553 factors

6    -- and I'll give you some additional explanation -- but in this

7    case, I am going to vary from the guidelines, and I am going to

8    impose a sentence of 108 months.  It is significantly less than

9    what the government is requesting.  The government is

10:46   10    requesting a sentence of 168 months.  This is five years less

11    than that.

12            I certainly have taken into account all the

13    government's arguments, and I agree with most of them.  The

14    only one that I really have a significant agreement is just

10:46   15    what the amount of the sentence should be, and I think that

16    when one considers all of the 3553 factors -- and I don't think

17    the government's request is an unreasonable one, but when you

18    look at the gentleman that is before me, even taking into

19    account that I think he committed criminal offenses for an

10:47   20    extended period of time and that he helped people commit crimes

21    for an extended period of time, 108 months for someone with no

22    prior criminal record who assisted people in their criminal

23    acts, I think -- for many of the people committing the criminal

24    acts, they would have committed them with or without Mr. Ramos.

10:47   25            But putting that aside, I think for the people that,

1    you know, Mr. Young, that you've referred to who are engaged in

2    criminal activity -- assisting other people to create criminal

3    activity, and if they somehow think that they are beyond the

4    law or that the sanction will not be a severe one, in that it

10:47    5    will just be, you know, some de minimis amount of custody, I

6    think a sentence of 108 months explains to them that that is

7    not the case, that it is a significant period of time, and that

8    I don't think that they would take it, you know -- take it

9    lightly.

10:48    10           And some of those individuals who are engaged in

11   committing other criminal activity, there is no suggestion that

12   they would necessarily get 108.  It could be much more.  But in

13   sentencing Mr. Ramos, I do obviously consider all the 3553

14   factors, and I have taken into account that he did lead

10:48    15   apparently a crime-free life for an extended period of time and

16   that he got involved in this, and he used to -- the tools that

17   he had and the business acumen that he had to commit a crime

18   for a long period of time.

19           But I think that when one considers how long

10:48    20   108 months is, I do think it is sufficient but not greater than

21   necessary to satisfy the 3553 factors.  I don't think it will

22   create a sentencing disparity.  It is hard to judge now because

23   there aren't many people in his circumstance.  It is really --

24   I don't think that he is really in Mr. Hanson's circumstance

10:48    25   because Mr. Hanson -- Mr. Hanson is in a different category.

1          So this is really, as both sides have pointed out, he

2     is sort of the first -- or one of the first to be convicted in

3     a long -- for the type of business that he did set up.

4          But I don't think that it would promote an unwarranted

10:49    5     sentencing disparity.  And I certainly considered whether

6     additional time was necessary, but I don't think that --

7     108 months is a very long, and for him to spend an extra five

8     years when he would be getting released after 108, to have him

9     for another five years, I don't think is necessary at this

10:49   10    point.  I understand the government's request for it, but I

11    don't think that it is.

12         It is a bit more than what defense counsel requested,

13    but I do think that when one balances certainly the size of the

14    criminal activity -- and it is not a case that -- you know, for

10:49   15    some it is not a case that this criminal activity occurred over

16    a weekend or a couple weeks.  I mean, certainly Mr. Ramos had

17    time to reflect upon it.  He was very financially successful,

18    and so I am sure that there were times he wondered whether he

19    would ever get caught or anything would happen, but for

10:50   20    whatever reason he was able to rationalize that and continued

21    to go on.

22         So he is not like the people that -- many of the

23    people who appear in court; they are young, 18, 19; they make a

24    decision to drive drugs from one place to the other; they think

10:50   25    about it for an hour; and they get $3,000, and they think that

is a lot of money.  He is in a different category.  He is a

smart gentleman, and I think he understood what he was doing.

He took a risk, and it didn't work out very well at the end.

But he has also accepted responsibility.  He's done

everything that he can to put himself in the best light

possible.

So after considering all the arguments of counsel and

all of the 3553 factors, the Court is going to impose a

sentence of 108 months.

Therefore, pursuant to Sentencing Reform Act of 1984,

it is the judgment of this Court that the defendant is

committed to the custody of Bureau of Prisons to be imprisoned

for a period that of 108 months.

Upon release from imprisonment, defendant is placed on

a three-year period of supervised release, subject to the

standard conditions, and in addition the following special

conditions:

If deported, excluded, or allowed to voluntarily

return to his country of origin, he not re-enter the United

States illegally and report to the probation officer within

24 hours of any re-entry into the United States.

Supervision is waived upon deportation, exclusion, or

voluntary departure.

Not engage in the employment or profession relating to

developing and maintaining encryption services and devices.

1          Report all vehicles owned or operated or in which you

2     have an interest to the probation officer.

3          Submit your person, property, residence, office, or

4     vehicle to a search conducted by a United States probation

10:51    5     officer at a reasonable time and a reasonable manner based upon

6     reasonable suspicion of contraband or evidence of a violation

7     of a condition of release.

8          Failure to submit to a search may be grounds for

9     revocation.

10:51   10          Defendant shall warn any other residents that the

11     premises may be subject to searches pursuant to this condition.

12          Provide complete disclosure, personal and business,

13     financial records to the probation officer as requested.

14          Notify the Collections Unit, United States Attorney's

10:52   15     Office, of any interest in property obtained directly or

16     indirectly, including any interest obtained under any other

17     name or entity, including a trust, partnership, or corporation.

18          And actually in this case is there a recommendation as

19     to fine?

10:52   20          MR. YOUNG:  No, Your Honor, no recommendation.

21          THE COURT:  All right.  The Court -- so notify the

22     Collections Unit, United States Attorney's Office, of any

23     interest in property obtained directly or indirectly, including

24     any interest obtained under any other name or entity, including

10:52   25     a trust, partnership, or corporation until the fine or

1    restitution is paid.

2            Although, in this case there is no fine and no

3    restitution, is that right, counsel, in light of the

4    forfeiture?

10:52    5            MR. YOUNG:  That's correct.

6            THE COURT:  And so, Mr. Young, in light of that is it

7    -- certainly, is it fair to say the government -- the Court

8    does not need to impose Condition 6 and 7 of the conditions of

9    supervised release?

10:52   10            MR. YOUNG:  That's correct.

11            THE COURT:  So I don't impose 6 or 7.

12            And would it be fair to say 8 -- 8 is a requirement

13    that he be prohibited from opening checking accounts or

14    incurring new credit charges.  It seems that wouldn't be

10:53   15    necessary as well; is that right?

16            MR. YOUNG:  That's correct.

17            THE COURT:  So the Court then imposed Conditions, 1,

18    2, 3, and 4, but in light of the defendant's acceptance of

19    responsibility and the agreement with respect to the

10:53   20    forfeiture, the Court will only impose Conditions 1, 2, 3, and

21    4, but declines to impose Conditions 5, 6, 7, and 8.

22            And the Court does not impose a fine in light of the

23    significant forfeitures that the defendant made.  Those have

24    been set out in the agreement, and it appears that the

10:53   25    defendant has forfeited the ill-gotten gains with the one

1    exception where there was an agreement that the defendant's

2    wife can keep half of the interest the home; is that right?

3            MR. YOUNG:  That's right, and the home has already

4    been sold.

10:54   5            THE COURT:  All right.  I think in light of the volume

6    of the forfeitures, I think the no fine is appropriate, so the

7    Court doesn't impose Conditions 5 -- Supervised Release

8    Conditions 5 through 8.

9            Mr. Sherman, would you please come forward and obtain

10:54  10   a copy of the terms of supervised release and please provide a

11   copy of those to your client.

12           MR. SHERMAN:  Yes, Your Honor.

13           THE COURT:  Counsel, in light of the sentence has your

14   client waived his right to appeal the sentence?

10:54  15           MR. SHERMAN:  He does, Your Honor.  We would ask that

16   the Court recommend imprisonment at Sheridan.  That is the

17   closest federal institution that I know of to Canada.

18           THE COURT:  All right.  I'll recommend that the

19   defendant be designated to a facility as close to Canada as

10:54  20   possible and in particular Sheridan if possible.

21           MR. SHERMAN:  Thank you very much.

22           THE COURT:  Are there any additional counts, counsel?

23           MR. YOUNG:  Yes, Your Honor.  We would dismiss Count

24   2.

10:54  25           THE COURT:  Count 2 will be dismissed.

1     Anything else from the government?

2     MR. YOUNG:  No, Your Honor.

3     THE COURT:  Thank you for your presentations.

4     Thank you for your presentations, counsel.

10:54 5     Anything further, Mr. Sherman?

6     MR. SHERMAN:  No.  Thank you.

7     MR. KATZ:  Thank you.

8     THE COURT:  All right.  Good luck to you.  Thank you.

9   (Proceedings concluded at 10:54 a.m.)

10       ---000---

11

       C-E-R-T-I-F-I-C-A-T-I-O-N

12

13    I hereby certify that I am a duly appointed, qualified
and acting official Court Reporter for the United States
District Court; that the foregoing is a true and correct
14 transcript of the proceedings had in the aforementioned cause;
that said transcript is a true and correct transcription of my
15 stenographic notes; and that the format used herein complies
with the rules and requirements of the United States Judicial
16 Conference.
    DATED:  October 31, 2019, at San Diego, California.

17

18         /s/ Melinda S. Setterman

19         _____
          Melinda S. Setterman,
20         Registered Professional Reporter
          Certified Realtime Reporter

21

22

23

24

25